# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

PAN AMERICAN, ET AL.,

    Plaintiffs,

    v.

MUNICIPALITY OF SAN JUAN,
PUERTO RICO, ET AL.,

    Defendants.

CIVIL NO. 18-1017 (PAD)

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Pan American Properties Corp. ("PAPC") sued the Municipality of San Juan and others[1] under 42 U.S.C. § 1983, challenging the constitutionally of Sections 9, 14, 18, 19, and 22 of Municipal Ordinance No. 12, 2017-2018 Series (the "Ordinance") in connection with the 2018 San Sebastian Street Festivities (the "Festivities")(Docket No. 1). It amended the complaint shortly after initiating the action to add Pan American Manufacturing Co., Inc. and Pan American Grain Company as plaintiffs in the case (Docket No. 6-1).

The challenges revolved upon the validity of restrictions on commercial speech and the extent of the Municipality's authority to regulate the use of drones over its air space. After considering the parties' arguments in light of the testimonial and documentary evidence presented at the preliminary injunction hearing held on January 16, 2018 and January 17, 2018, the court GRANTED IN PART AND DENIED IN PART plaintiffs' request for a preliminary injunction. As

---

[1] The Municipality's Mayor (Hon. Carmen Yulín Cruz Soto) and Vice Mayor (Rafael Jaume), the Municipal Assembly's President (Hon. Marco A. Rigau), and the Municipality's Permits Office Director (Juan Gallisá). Because the individual defendants were sued in their official capacity, unless otherwise stated the court will collectively refer to all defendants as the "Municipality."

anticipated when the ruling was announced in open court, this Opinion and Order serves to elaborate on the decision's findings and conclusions.[2]

## I. INTRODUCTION

At 7:27 p.m. on Friday, January 12, 2018, PAPC initiated the action (Docket No. 1). On Sunday, January 14, 2018 at 3:34 p.m., the case was electronically assigned to the undersigned (Docket No. 2). On their face, Sections 9, 14, 18 and 19 burdened commercial speech, raising serious underinclusiveness, and unbridled discretion issues under the First Amendment, whereas Section 22 ran up to a preemption question involving the scope of the Municipality's authority to regulate the use of drones over the Municipality's airspace. As a result, the court: (1) issued a Temporary Restraining Order at 5:52 p.m. on the same day the case was assigned; (2) required PAPC to notify and serve defendants within 24 hours and to post a $5,000 bond or certified check to cover damages not later than noontime on January 16, 2018; (3) set a deadline for defendants to respond; and (4) scheduled a preliminary/permanent injunction hearing for January 16, 2018 at 3:00 p.m. (Docket No. 3). On January 15, 2018, PAPC informed the court of having provided defendants' counsel with copy of the pleadings and of the court's order (Docket No. 8).[3]

On January 15, 2018, Ms. Cruz, Mr. Jaume and the Municipality were served with process (Docket Nos. 9-11). On January 16, 2018, Mr. Rigau and Mr. Gallisá were served (Docket Nos. 21-22), and defendants presented their opposition to plaintiffs' injunction request (Docket No. 25). Prior to the hearing, the court met with counsel in chambers; discussed with them at length their factual and legal theories; and agreed to the parties' request to separate the preliminary and permanent

---

[2] At the end of the hearing, the court expressed that it would issue the Opinion and Order the following day. For completeness, it awaited until after the hearing transcripts were filed and reviewed. In the meantime, it expanded the scope of its analysis.

[3] On January 14, 2018, plaintiffs informed that Ms. Cruz, Mr. Jaume, Mr. Rigau, Mr. Gallisá and the Municipality were notified by email with copy of all the documents in the docket "as courtesy and in good faith" (Docket No. 6).

injunction stages of the case (Docket No. 39).  The hearing took place in the afternoon and evening of January 16, 2018 and on the morning, afternoon and evening of January 17, 2018 (Dockets No. 39 and 40).  At the conclusion of the evidentiary phase of the hearing on January 17th, the court heard arguments from the parties, and the same day issued a ruling from the bench granting in part and denying in part the request for preliminary injunction (Docket No. 40).

## II.    FACTUAL FINDINGS

### A. <u>Background</u>

The Festivities are a multi-day event with commercial, cultural and artistic elements promoting Puerto Rican culture (Docket No. 6-1, § IV(1)).[4]  Held in Old San Juan on the second or third week of January, they are a highly attractive celebration for residents of Puerto Rico as well as for tourists.  Id. at § IV(2).  About twelve cruise ships were scheduled to arrive in San Juan for this year's event, set to begin on January 17, 2018 and to end on January 21, 2018.  Id. at §§ IV(2), IV (6).  By some estimates, more than one million people were expected to attend (Transcript Day One, p. 25).[5]  The enormous concentration of local, national and international consumers during the Festivities provided merchants with a unique opportunity to promote and sell their products.  Id. at § IV(3).

Plaintiffs are affiliated companies (Transcript Day One, pp. 48, 71).  In previous years, they engaged in commercial activities throughout the Festivities, distributing promotional

---

[4] The parties stipulated Paragraphs II(3), II(4), II(5), II(6), II(7), IV(1), IV(2)(except for estimate of visitors), IV(3), IV(4), and IV(6) of the "First Amended Verified Complaint for a Temporary Restraining Order and Injunctive Relief" (Docket No. 5).  <u>See</u>, Minutes of Proceedings, January 17, 2018 (Docket No. 42, pp. 2-3).

[5] The transcripts of the Preliminary Injunction Hearing held on January 16, 2018 and January 17, 2018 were filed in three separate dockets (Docket Nos. 35, 36 and 37).  For ease of reference, the court will refer to the Transcript of the Preliminary Injunction held on 1/16/2018, filed at Docket No. 35, as "Transcript Day One;" to the one including the morning session of the second day of the Preliminary Injunction held on 1/17/2018, filed at Docket No. 36, as "Transcript Day Two-AM;" and to the one including the afternoon session of the second day of the Preliminary Injunction hearing held on 1/17/2018, filed at Docket No. 37, as "Transcript Day Two-PM."

materials and displaying advertisements (Docket No. 6-1, § IV(3); Transcript Day One, p. 26).

PAPC owns consumer products bearing the Gasolina, Salsa Rico and Space Gang brands (<u>id.</u> at p.

11); Pan American Grain Manufacturing owns the Arroz Rico brand (<u>id.</u>); and Pan American Grain

Company owns the Café Mami, Café del Patio and Harina Rico brands. <u>Id.</u> at p. 53.

**B.  <u>Ordinance</u>**

On Saturday, December 23, 2017, the Municipal Assembly approved the Ordinance

(Docket No. 1-2, p. 22).  On Tuesday, December 26, 2017, the Mayor signed it.  <u>Id.</u> at p. 23.  The

Ordinance was to be in effect ten days "after its publication by the standards established in Act

No. 81 [of August 30], of 1991 . . .," P.R. Laws Ann. tit. 21 §§ 4003 <u>et. seq.</u>,[6] until 12:01 a.m. on

January 22, 2018.  <u>Id.</u> at pp. 22-23.  Its purpose was to look after order and safety during the

Festivities (Transcript Day Two – AM, p. 32).  There was no evidence as to when the Ordinance

was published in order to identify the date of its effectiveness, albeit the parties assumed it was

published the day the Mayor signed the Ordinance and became effective on Friday, January 5,

2018.

As in the past, the Ordinance was approved to regulate the security and way businesses

operate during the Festivities (Docket No. 46, p. 1).  Defendants viewed it as part of legislative

measures enacted "to control commercial advertising" in the Festivities in order to prevent a "free

for all for commercial purposes" (Docket No. 25, pp. 5-6).  From their perspective, the public

interest is best served "when there is adequate control of the promotional efforts of businesses,

particularly as to marking and consumption of alcoholic beverages."  <u>Id.</u> at p. 17.

---

[6] The statute is known as the "Autonomous Municipalities Act of the Commonwealth of Puerto Rico," P.R. Laws Ann. tit. § 4003, <u>et seq.</u>

C. **Challenged Provisions**

Plaintiffs challenge Sections 9, 14, 18, 19 and 22 of the Ordinance.  Section 9 states:

> The installation, use, presentation, raising all kinds of promotional inflatables of any item or product in the areas of Puerta de Tierra, Old San Juan, La Puntilla, and La Perla within the Isleta de San Juan is prohibited.  Any natural or legal person, company, trade or residence owner who violates the provisions of this Section of this Ordinance shall be subject to payment of an administrative fine of five thousand dollars ($5,000.00) for each occurrence.

> This provision applies both to the natural person or legal owner of the inflatable, and the natural or legal owner of the establishment, space and / or residence where the inflatable article is located, as the trading company that promotes, the organizer and/or promoter activity and / or meeting where the inflatable installed; They are all subject to being ticketed separately and independently in the sum of five thousand dollars ($5,000.00) each way for each occurrence. From a second offense, if the trader[7] insists on violating the provisions of this section, it incurs a concerted act, repeated or systematic failure, the municipal police or inspectors Permit Office will proceed with proceedings before offices, agencies or appropriate for revocation of permits for the establishment and closure of the establishment or kiosk (Docket No. 1-2, p. 9).

Section 14 states:

> The distribution of promotional products or samples of commercial products in the area of the islet of San Juan during the Festival of San Sebastian Street without written permission from the Permit Office of the Autonomous Municipality of San Juan authorization is prohibited.  This includes the installation of inflatable advertisements in public areas and facades.  Understanding that a commercial product is any material that can be susceptible of sale or represents an economic transaction.

> Any person who violates the provisions hereof shall be subject to payment of an administrative fine of five thousand dollars ($5,000) per violation.

---

[7] The Spanish language original refers to "comerciante" (merchant), albeit "trader" and "merchant" may be synonyms.

This provision applies both to the person delivering promotional materials or objects such as the commercial business being promoted, the organizer and/or promoter activity and/or meeting. They are all subject to being ticketed separately and independently in the sum of five thousand dollars ($5,000) above provided. Each violation will be subject to a fine (Docket No. 1-2, p. 11).

Section 18 states:

It is prohibited that the owners of business and/or residences, rent or cede their balconies in order to carry out promotions, or for commercial advertising be deployed for such purposes, and/or display products from these balconies, without the proper permits to be issued by the Office of permits of the Municipality of San Juan.

It is further provided that it is prohibited to throw any promotional material or object from the balconies and /or elevated structures, including temporary platforms. Any person who violates the provisions hereof shall be subject to payment of an administrative fine of five thousand dollars ($5,000.00) per occurrence.

This provision applies both to the person who launches the promotional materials or objects such as commercial business being promoted, the organizer and / or promoter activity and/or meeting, and the owner or owner of the establishment or residence from where the act is done; They are all subject to being ticketed separately and independently in the sum of five thousand dollars ($5,000.00) above provided.

It is also provided that, according to the inspection process conducted by the Municipality of San Juan by the Fire Department of Puerto Rico, and recommendation issued by the latter regarding the balconies of residential and commercial structures in disrepair, it is essential to submit to the Permit Office of the Municipality of San Juan a certificate by a structural engineer to the effect that the balcony meets standards required in the industry to be used, and that there is no risk in carrying out any activity in the balcony. Failure to comply with this requirement will prevent the granting of any license and use of space during the holiday period for reasons of public safety (Docket No. 1-2, p. 15).

Section 19 states:

Temporary Signage on public facades or on public spaces, is prohibited including temporary signage to look outside through a

glass facade without the approval of the Permit Office of the Municipality of San Juan, during the days of the Festival.[8]

Similarly, the deployment of "comparsas" promoting any commercial product is prohibited without the authorization of the Office of Permits of the Municipality.[9] Any person who violates the provisions hereof shall be subject to payment of an administrative fine of two thousand dollars ($ 2,000.00) per occurrence, and in the case of commercial troupes, the company whose product is promoted shall be subject to payment of an administrative fine of five thousand dollars ($ 5,000.00) per occurrence.

It will also be subject to payment of an administrative fine of one thousand dollars ($ 1,000.00) each member of the commercial comparsa per person. For these purposes, it will be considered as part of the commercial comparsa all uniformed persons where that uniform promotes the product advertised in the parade or any musician who is part of this with the purpose of promoting the product advertised (Docket No. 1-2, p. 17).

Section 22 states in part:

The use of items, equipment or flying objects, helicopters, such as drones, except those authorized by government agencies with authority in law, and those belonging to the Autonomous Municipality of San Juan, and sponsors and the duly authorized parties responsible for production are prohibited.

Any person who violates the provisions hereof shall be subject to payment of an administrative fine of five thousand dollars ($5,000) per occurrence (Docket No. 1-2, p. 18).

### D. Permit Application Process

On Tuesday, January 9, 2018, PANC'S Marketing Coordinator Supervisor, Xiomara

Rivera Montalvo visited the Municipality's Permits Office to request a temporary use permit in

---

[8] The Permits Office Director interpreted "public façade" to mean something that can be seen from a public space (Transcript Day Two-AM, pp. 55-56). The Permits Office in-house counsel understood the term to mean the façade of a public building. Id. at 56. As the Director explained, the in-house attorney's interpretation controls. Id.

[9] "Comparsas" are a group of two or more people with distinctive clothing or other features with a message (Transcript Day Two-AM, p. 54).

order to use all of the Pan American affiliated companies' promotional materials throughout the Festivities (Transcript Day One, pp. 48, 50, 102).[10] She spoke with Mr. Alejandro Cuadrado, a Permits Technician, who informed her that she had to submit a memorial explaining her request. Id. at 51, 93-94.[11] So, Ms. Rivera went back to her office; prepared a memorial in letter format indicating that "they" intended to use tents, inflatables, labeling and promotional marches in the Festivities; and returned to the Permits Office later that day to deliver the letter (Transcript Day One, pp. 64, 93-94).

The person Ms. Rivera handed the memorial to in the Permits Office gave her a form titled "Permits Office, Municipality of San Juan, Temporary Permit, Explaining Memorandum," with blanks to fill under the following categories: (1) "Activity Name," (2) "Company Name and/or entity in charge," (3) "Place of Activity," (4) "Date and Time of activity," and (5) "Description (use being requested)" (Joint Exhibit II). The Municipality uses the form to evaluate temporary permit requests.[12] As to those categories Ms. Rivera responded: (1) San Sebastian Street Festival 2018; (2) Pan American Grain; (3) Old San Juan (All Streets); (4) From January 17 through 21, 2018, 24 hours; and (5) Promotion, Posting of Signs, Street Theatrics and all other promotional materials. Id.

Given that Mr. Cuadrado had informed Ms. Rivera that it would take the Permits Office three or four days to evaluate the application (Transcript Day One, p. 52), she contacted the Office to follow up on the status of the application three days later. Id. at pp. 66-67. The municipal

---

[10] Ms. Rivera is employed by Pan American Grain Mfg., Co. Inc., but supervises marketing coordination for all of the Pan American affiliated companies (Transcript Day One, pp. 10-11, 95).

[11] Mr. Cuadrado did not recall speaking with Ms. Rivera (Transcript Day One, p. 109).

[12] Mr. Cuadrado and the Permits Office Director explained that the Permits Office did not have an application document for the Festivities because it relied on the same document used to apply for temporary permits in other activities (Transcript Day One, pp. 108-109, 119-120).

employee she spoke to, however, informed her that the request "had been filed" ("archivada") Id. From those words, Ms. Rivera understood the application had been dismissed and that the Permits Office would not evaluate it any longer. Id. at pp.66-67. Later that same day, PAPC initiated the action.[13] The following Tuesday, January 16, 2018 (the day of the preliminary injunction hearing), the Permits Office e-mailed to Pan American Grain Mfg. Co. a "DISMISSAL NOTICE" stating that the application had been dismissed without prejudice for "lack of the minimum information necessary for … [the Permits Office] to consider it" (Joint Exhibit II). The notice stopped short of explaining or specifying what that information was.[14]

## III.    DISCUSSION: PRELIMINARY INJUNCTION

Whether or not to issue a preliminary injunction depends on four factors: (1) plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of preliminary injunctive relief; (3) whether issuing the injunction will burden defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest. See, Sindicato Puertorriqueno de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (articulating and applying test); New Comm. Wireless Services., Inc. v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir. 2002)(same). Though each factor is important, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits." Sindicato Puertorriqueno de Trabajadores, 699 F.3d at 10. The initial burden of persuasion is on the moving party. FF Cosmetics v. City of

---

[13] According to the Verified Amended Complaint, on January 10, 2018, the Municipality's Vice Mayor contacted PAPCs' counsel to inform him that the application process had ended on January 9, 2018; and given that the application was presented on January 10, 2018, it would be denied as late (Docket No. 5 at ¶ 14). No evidence on the subject was tendered during the hearing.

[14] The parties debated the use of the operative term included in the Notice (Transcript Day One, pp. 126-127). The Spanish original reads "Archivo," which may be translated as "Filed," whereas the Certified English translation uses the word "Dismissal." At the end of the day, the application was not approved (Transcript Day Two-AM, p. 45), albeit without prejudice, meaning that it could have been reopened with new information (Transcript Day One, p. 127).

Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017)(so noting).  However, the ultimate burden is

on the party who would have the burden at trial.  Id.

**A.  Likelihood of Success on the Merits**

Likelihood of success on the merits is dependent upon the principles underlying the

constitutional challenges.  As discussed below, the most salient challenges concern the First

Amendment.  To set the stage for review, the court describes the First Amendment; the different

levels of scrutiny to which it subjects provisions banning or restricting protected speech; the

framework developed to evaluate limits on commercial speech; and the requirements underlying

licensing or permitting schemes that operate as prior restraints.  Lastly, it applies these principles

to the present dispute.

**1.  First Amendment**

The First Amendment forbids Congress from enacting laws abridging "freedom of speech."

U.S. Const. Amend I.  Although the language speaks in terms of what is forbidden to "Congress,"

it has long been established that "the conception of liberty under the due process clause of the

Fourteenth Amendment embraces the right of free speech," Stromberg v. California, 283 U.S. 359,

368 (1931), and that its provisions therefore apply to state and municipal governments vested with

state authority.  See, Reed v. Town of Gilbert, 573 U.S.----, 135 S. Ct 2218, 2226 (2015)

(identifying scope of application); Lovell v. City of Griffin, 303 U.S 444, 450 (1938)(recognizing

as well settled, that municipal ordinances adopted under state authority constitute state action

within the First Amendment's prohibition).  Even though Puerto Rico is not a state, the prohibition

applies here.  See, Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico, 478

U.S. 328, 331 & n.1 (1986)(so recognizing); Watchtower Bible Tract Soc. of New York v.

Municipality of Santa Isabel, 2013 WL 1908307, *2 & n.1 (applying First Amendment to

municipalities in Puerto Rico, pointing out that "[t]he very same First Amendment rights that protect citizens of the fifty States equally protect the citizens of Puerto Rico").  In general, the proscription bars the government from dictating what we speak, hear, see, or read, Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002)(describing prohibition), thereby presuming that "speakers, not the government, know best both what they want to say and how to say it."  Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781, 790-791 (1988).

### a. Levels of Scrutiny

The purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating speech, the press, and religion.  Id. at 791 (so observing)(quoting Thomas v. Collins, 323 U.S. 516, 545 (1945)(Jackson, J., concurring)).  As such, it does not tolerate governmental control over the content of messages expressed by private individuals except in narrow circumstances.  See, Turner Broadcasting System, Inc. v. F.C.C., 512 U.S. 622, 641 (1994)(discussing concept).  Government action that stifles speech on account of its content poses the inherent risk that the government may not be attempting to advance a legitimate regulatory goal.  Id.  Precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential content-based burdens on speech.  Id.

To sustain content-based restrictions, the government must prove both a compelling state interest and that the means used to achieve that interest are the least restrictive available.  See, U.S. v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813 (2000)(applying test).  In practice, "the test is exceedingly difficult to satisfy."  Showtime Entertainment LLC v. Town of Mendon, 769 F.3d 61, 71 (1st Cir. 2014).  In those cases, the vast majority of regulations are held to unconstitutionally inhibit speech.  Id.  This broad protection extends to expressive conduct, Id. (citing R.A.V. v. City of St. Paul Minn., 505 U.S. 377, 382 (1989)), as lawmakers may no more

silence unwanted speech by burdening its utterance than by censoring its content.  See, Sorrell v. IMS Health, Inc., 564 U.S. 552, 566 (2011)(explaining burdens and degrees of scrutiny). Commercial speech qualifies for these protections.  Id.[15]

Regulations that are unrelated to the content of speech are subject to a different level of scrutiny.  See, Turner Broadcasting System, Inc., 512 U.S. at 641 (distinguishing among types of regulations).  The nature of the forum and the type of restriction dictate the standard against which restrictions unrelated to content are measured.  See, New England Regional Council of Carpenters v. Kinton, 284 F.3d 9, 20 (1st Cir. 2002)(so noting).   For these purposes, a forum can be "a traditional public forum, a designated public forum (sometimes called a limited public forum) or a non-public forum."  Id.  Public streets, sidewalks, and parks "are presumptively public fora."  Id.

In a traditional or designated public forum, an intermediate level of scrutiny applies.  Id. This standard authorizes the government to impose reasonable restrictions on the time, place or manner of protected speech as long as the restrictions are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication of the information.  See, Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)(discussing test); Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)(similar).  Failure to satisfy any of these elements invalidates the restriction.  See, Kuba v. 1-A Agricultural Association, 387 F.3d 850, 858 (9th Cir. 2004)(so recognizing); Edwards v. District of Columbia, 735 F.3d 996, 1002 (D.C. Cir. 2014)(same).  Even though such a law "might restrict a greater amount of expression in absolute terms than one that favors certain types of

---

[15] The First Amendment protects even dry information devoid of advocacy, political relevance, or artistic expression.  See, Universal City Studios, Inc. v. Corley, 273 F.3d 429, 446 (2nd Cir. 2001)(discussing scope of first amendment protection).

messages over others, it has the virtue of not singling out any idea or topic for favored or unfavored treatment." Cutting v. City of Portland, 802 F.3d 79, 84 (1st Cir. 2015).

In a non-public forum, the constitutional hurdle is considerably lower: to clear it, a content-neutral restriction need only be reasonable. See, Kinton, 284 F.3d at 20 (examining topic). In those settings, the reasonableness of a particular regulation is determined by a fact-intensive balancing test that takes into account such factors as the uses to which the forum typically is put; the particular risks associated with the speech activity at issue; and the proffered rationale for the restriction. Id. As such, it drives the inquiry of content-neutral restrictions into the intermediate level of scrutiny. Id.

### b. Commercial Speech

At its core, commercial speech is speech that does "no more than propose a commercial transaction." U.S. v. United Foods, Inc., 533 U.S. 405, 409 (2001). It involves "expression related solely to the economic interests of the speaker and its audience." El Día, Inc. v. Puerto Rico Department of Consumer Affairs, 413 F.3d 110, 115 (1st Cir. 2005). Whether speech may be so characterized depends on whether: (1) the speech concerns proposals to engage in commercial transactions; (2) the speech references a specific product; and (3) the messenger has an economic motivation. See, Albarado v. Kentucky Racing Com'n, 496 F.Supp.2d 795, 805 (W.D. Ky. 2004)(discussing issue)(citing Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 66-67 (1983)).

Speech in aid of marketing fits this category. See, Sorrell, 564 U.S. at 557(recognizing speech in aid of marketing as commercial speech). It includes the display of brand or trade names in promotional materials such as signs, banners, flyers, matchbooks, lighters, envelopes, brochures, glasses, and books. See, Posadas de Puerto Rico Associates, 478 U.S. at 333 (considering use of word "casino" in promotional articles commercial speech); Wine and Spirits

Retailers v. Rhode Island, 481 F.3d 1, 8 (1st Cir. 2007)(trade name and commercial speech); Ballen

v. City of Redmond, 466 F.3d 736, 740, 742 (9th Cir. 2006)(portable sign advertising product

deemed commercial speech); Albarado, 496 F.Supp.2d at 799, 805 (same with respect to

advertising and promotional logos in racing jockey's attire).

The extent of the constitutional protection that commercial speech has received has varied

throughout the years. *Compare* Valentine v. Chrestensen, 316 U.S. 52 (1942)(sustaining

conviction for unauthorized distribution of handbills, reasoning that the "Constitution imposes no

. . . restraint on government as respects purely commercial advertising") *with* Virginia State Bd.

of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 761-762

(1976)(recognizing that First Amendment protects commercial speech from unwarranted

government regulation). Despite this variation in treatment, the Supreme Court has recognized

that the free flow of commercial information is "indispensable to the proper allocation of resources

in a free enterprise system because it informs the numerous private decisions that drive the

system." Rubin v. Coors Brewing Co., 514 U.S. 476, 481 (1995). That flow not only serves the

economic interest of the speaker but also assists consumers, furthering the societal interest in the

fullest possible dissemination of legitimate information. See, Virginia State Board of Pharmacy,

425 U.S. at 762-765 (discussing topic); American Academy of Implant Dentistry v. Parker, 860

F.3d 300, 306 (5th Cir. 2017)(same). Albeit advertising communicates only an incomplete version

of the relevant facts, the First Amendment presumes that some accurate information is better than

no information at all. See, Central Hudson Gas & Electric Corp. v. Public Service Commission,

447 U.S. 557, 561-562 (1980)(so noting). Thus, the Supreme Court now affords commercial

speech "a measure of First Amendment protection 'commensurate' with its position in relation to

other constitutionally guaranteed expression." Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 553 (2001).

Seeing the distinction between speech that proposes a commercial transaction and other varieties of speech, however, in Central Hudson, 447 U.S. at 557, the Supreme Court adopted a four-prong test to analyze regulations of commercial speech that is substantially similar to the test used to evaluate content-neutral time, place, and manner restrictions. See, Reilly, 533 U.S. at 554 (describing *Central Hudson* test). Pursuant to this test, courts must determine whether: (1) the speech concerns a lawful activity and is not misleading; (2) the government's asserted interest in restricting speech is substantial; (3) the restriction directly advances the asserted governmental interest; and (4) the restriction is not more extensive than necessary to meet that interest. See, Central Hudson, 447 U.S. at 566 (articulating test).[16] The first part of the test is a "threshold determination" whether the speech is constitutionally protected because it is either true or only potentially misleading. See, Byrum v. Landreth, 566 F.3d 442, 446 (5th Cir. 2009)(so observing). If it is not so protected, the Central Hudson inquiry ends there. See, Wine and Spirit Retailers, 481 F.3d at 8 (applying formulation). Should the speech be protected and the government interest substantial, the inquiry moves to the third and fourth elements of the test. See, Central Hudson, 447 U.S.at 566 (so holding).

The government bears the burden of satisfying all of these elements to justify restrictions on commercial speech. See, Ibanez v. Florida, 512 U.S. 136, 142-143 (1994)(evaluating elements); Edenfield v. Fane, 507 U.S. 761, 767-771 (1993)(similar). Failure to satisfy any of

---

[16] As Justice Breyer recently observed, the *Central Hudson* test is a lesser, but still an "elevated" form of first amendment scrutiny. See, Expressions Hair Design v. Schneiderman,---U.S.----, 137 S.Ct. 1144, 1152 (2017)(Breyer, J., concurring). Justice Thomas would apply strict scrutiny if the government sought to restrict truthful speech irrespective of whether the speech in question is characterized as commercial. See, Reilly, 533 U.S. at 572 (Thomas, J., concurring).

them invalidates the restriction.  See, Greater New Orleans Broadcasting Ass'n. v. United States, 527 U.S. 173, 186, 188, 193 (1999)(accepting characterization of government's interests as substantial, but invalidating statutory ban under Central Hudson's third and fourth prongs); Rubin, 514 U.S. at 483, 488, 490-491 (similar); Ballen, 466 F.3d at 742 (agreeing that ordinance satisfied Central Hudson's first two prongs; not reaching issue of whether it satisfied the third prong; and concluding that it failed to satisfy the fourth prong); FF. Cosmetics, 866 F.3d at 1298-1301 (ordinance invalid under Central Hudson's fourth prong).  The government's burden "is not slight." Ibanez, 512 U.S. at 143.  The free flow of commercial information "is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful." Id.

### c. Licensing/ Permitting Schemes

Licensing and permitting schemes requiring prior government authorization to engage in speech are linked to the doctrine of prior restraint.  See, Forsyth County, Ga v. Nationalist Movement, 505 U.S. 123, 131 (1992) (referring to license to exercise First Amendment freedoms as prior restraint); Lusk v. Village of Cold Spring, 475 F.3d 480, 485 (2nd Cir. 2007)("A law requiring prior administrative approval of speech falls within the prior restraint rubric"); World Wide Street Preachers' Fellowship v. City of Grand Rapids, 2007 WL 1462130, *2 (W.D. Mich. May 16, 2007)(statutes or ordinances that require permits from local authorities as a prerequisite to engage in expressive activities are a prior restraint on freedom of speech); Ervin Chemerinsky, *Constitutional Law: Principles and Policies* (4th Ed. 2011), 978-979, 993 (a rule requiring some form of license or permit before one may engage in expression is a prior restraint on speech).[17]

---

[17] In Sullivan v. City of Augusta, 511 F.3d 16 (1st Cir. 2007), the First Circuit held that content neutral permit requirements for parades and other public assemblies in parks and streets are not to be reviewed as a prior restraint but as a reasonable regulation of

To comport with the First Amendment, these schemes cannot place unbridled discretion in the hands of government officials.  See, FW/PBS v. City of Dallas, 493 U.S. 215, 225-226 (1990) (1990)(O'Connor, J. plurality opinion)(explaining prohibition).[18]  Two lines of cases have sprouted in this soil: one focused on the substantive criteria that restrain official discretion and the other on procedural safeguards.  See, Kinton, 284 F.3d at 21 (so noting).

The substantive strand demands that ordinances contain narrow, objective, and definitive standards to guide the licensing authority.  Id.  at 21.  Otherwise, the provision is invalid.  See, World Wide Street Preachers' Fellowship, 2007 WL 1462130, *2 (acknowledging principle).  The requirement applies in case of prior restraints (id.), and content neutral time, place, and manner regulations.  Kinton, 284 F.3d at 21 (addressing topic).  Without clear standards, "post hoc rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable expression."  Van Wagner Boston, LLC v. Davey, 770 F.3d 33, 36 (1st Cir. 2014).  Moreover, the ordinance would not be narrowly tailored to serve the government's interests.  See, Gaudiya Vaishnava Society v. City and County of San Francisco, 952 F.2d 1059, 1065-1066 (9th Cir. 1990)(holding that as an application of the requirement that restrictions be narrowly tailored, a law cannot condition the free exercise of First Amendment rights on the unbridled discretion of government officials); Paulsen v. Lehman, 839 F. Supp. 147, 164 (E.D. N.Y. 1993)(to qualify as narrowly tailored, a content neutral ordinance

the time, place, and manner in relation to alternate uses of those locations.  Id. at 32 (so noting).  The distinction between a prior restraint and a time, place, and manner restriction does not lead to different results in this case.

[18] As discussed below, unbridled discretion is fatal to licensing/permitting schemes whether viewed as prior restraints or as content neutral, time, place, and manner restrictions on speech.

must avoid vesting government officials with unbridled discretion to grant or deny licenses to conduct First Amendment expressive activity).

The procedural strand was elaborated in Freedman v. Maryland, 380 U.S. 51 (1965), where the Supreme Court ruled, in the motion picture licensing context, that prior restraints may be imposed only temporarily; that they must allow for prompt judicial review; and that the licensor must bear the burden of asking a court to suppress the speech. Id. at 58-60. In FW/PBS, 493 U.S. at 215, the Court reasoned from Freedman that to be valid, the licensor must make the decision whether to issue the license within a specified and reasonable time period, with the possibility of prompt judicial review in the event that the license is erroneously denied. Id. at 226-228. In Thomas v. Chicago Park Dist., 534, U.S. 316 (2002), the Court held that Freedman's procedural requirements do not apply to permit schemes that eschew any consideration of the content of speech. Id. at 780. Nevertheless, even content-neutral time, place, and manner regulations must contain adequate standards to guide the official's decision and render it subject to effective judicial review. Id.

Relying on Thomas, some courts have held that time limits are not *per se* required for a content-neutral permitting scheme, stating that all that is required are "adequate standards to guide the official's decision." Granite State Outdoor Advertising v. City of St. Petersburg, 348 F.3d 1278, 1281-1282 (11th Cir. 2003). See also, Covenant Media v. City of North Charleston, 493 F.3d 421, 435 (4th Cir. 2007)(concluding, based on Thomas, that because the sign regulation at issue was content-neutral, it did not need time limitations on decisionmaking). Thomas, however, was not "directed to communicative activity as such, but rather to all activity conducted in a public park." Thomas, 534 U.S. at 322. And it contained a time limit. Id. at 324.

By contrast, the permit provisions here target commercial speech. Additionally, in Kinton the First Circuit noted that the automatic issuance of permits therein negated any concern that "officials could effectively deny permits by dragging their feet." Kinton, 284 F.3d at 25. Thus, so viewed, one species of unbridled discretion is "lack of time limits on processing applications." Nittany Outdoor Advertising v. College, 22 F.Supp.3d 392, 411 (M.D. Pa. 2014). As observed in FW/PBS, the failure to confine the time limit within which the licensor must make a decision contains the same vice as a statute delegating excessive administrative discretion, for a scheme that fails to set reasonable time limits on the decisionmaker allows the official to pocket veto the permit application for those bearing unfavorable messages, further creating the risk of indefinitely suppressing permissible speech. See, FW/PBS, 493 U.S. at 226-227 (analyzing issue); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1272 (11th Cir. 2005)(similar).

### d. Standing

The Municipality contends that PAPC and Pan American Manufacturing Co. lack standing because they never sought permits to carry out promotional activities during the Festivities (Docket No. 25, pp. 4, 9-10). Article III of the Constitution confines federal courts to the adjudication of actual cases and controversies. See, Davey, 770 F.3d at 36 (so recognizing)(citing U.S. Const. art. III, § 2, and Valley Forge Christian College v. Americans. United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982)). Ascertaining whether a matter is a case or controversy within the meaning of Article III assumes particular importance in ensuring that the Federal Judiciary respects the proper and properly limited role of the courts in a democratic society. Id. A fundamental component of an Article III case is plaintiff's standing to press its claim. See, Allen v. Wright, 468 U.S. 737, 751 (1984)(describing standing).

The doctrine of standing "serves to identify those disputes which are appropriately resolved through the judicial process." Whitmore v. Arkansas, 495 U.S. 149, 155 (1990). It embraces several limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches of government and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law or provision invoked. See, Allen, 468 U.S. at 751 (discussing topic). Its irreducible constitutional minimum requires injury, an element predicated on a showing that: (1) plaintiff suffered an "injury in fact" – an invasion of a legally protected interest which is: (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the injury was caused by the conduct complained of in a manner fairly traceable to the challenged action of the defendant, not to the independent action of some third party not before the court; and (3) the relief sought is likely to redress the injury suffered. See, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)(articulating requirements). The party invoking federal jurisdiction bears the burden of establishing each of these elements (id. at 561), a requirement with which plaintiffs have complied.

Plaintiffs are affiliated companies. While Ms. Rivera is employed by Pan American Grain Mfg. Co., she supervises marketing coordination for all plaintiffs. In the memorial letter that she submitted to the Municipality, she used the pronoun "we." Even though the Municipality did not ask for clarification, Ms. Rivera testified that she was referring to the Pan American entities: "Pan American Grain Manufacturing," "Properties," and "Company" (Transcript Day One, p. 80).[19] In

---

[19] In the form that Ms. Rivera subsequently filled out, she identified Pan American Grain under the category "Company name *and/or entity in charge*" (emphasis added). The title of the category suggests that for the Municipality, an entity could be in charge of the activity for which the permit was sought, coordinating or directing other participating entities.

this way, she stated that "they" wished to promote the Gasolina, Space Gang, Café Mami, and Arroz Rico brands, among other brands. Id. at 50.

Different Pan American companies owned those product brands, but marketing efforts were made and managed through Pan American Grain on behalf of its affiliates (Docket No. 5-1, p. 2). Thus, assuming the permit application were interpreted as having been exclusively presented on behalf of Pan American Grain, depriving Pan American Grain of the opportunity to engage in constitutionally protected commercial speech correspondingly harmed its affiliated companies by depriving them of a concerted medium to promote their products during a period of admittedly increased commercial activity. That injury was concrete, particularized and imminent, not conjectural or hypothetical. In consequence, plaintiffs made a sufficient showing of harm flowing from the complained of conduct to confer them standing to maintain the action.

On a different track, when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially under the First Amendment without the necessity of first applying for, and being denied a license. See, City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 755-756 (1988)(so stating); Lovell, 308 U.S. at 452-453 (allowing party to contest validity of facially void ordinance without having sought permit under it). It is the very existence of official standardless discretion, not being harmed by the unfavorable exercise of such discretion, that gives rise to injury sufficient to warrant standing. See, Davey, 779 F.3d at 38 (so recognizing). Plaintiffs mounted a facial first amendment challenge to Sections 9, 14, 18 and 19 of the Ordinance, complaining, *inter alia*, of the lack of written criteria on how the Municipality's Permits Office would handle permit applications (Docket No. 5, pp. 12-13). Consequently, all of them have standing. See, Beckerman v. City of Tupelo, 664 F.2d 502, 506-507 (5th Cir. 1981)(conferring

standing on a plaintiff who challenged a regulatory permitting scheme that granted a state official

unbridled discretion over the licensing of its expressive conduct); Davey, 779 F.3d at 42 (same).

### e. Application of Constitutional Principles to Challenged Provisions

The record shows plaintiffs intended to engage in commercial speech or commercially

related expressive activities to market, advertise and promote legitimate commercial products in a

nonmisleading way during the Festivities. In general, these expressive activities would take place

in streets, sidewalks, squares, open spaces, balconies, and business establishments, using

promotional caps, t-shirts, cups, inflatables and signs. All of the promotional material would carry

and show product brand logos. In the context of the Festivities' unique setting, they directed

potential consumers' attention to the products being promoted, operating as proposals to engage

in commercial transactions for economic gain.

The restrictions to which these endeavors were to be subjected are discussed below. With

the exception of Section 9 and Section 22, the challenged provisions conditioned commercial

speech to a permit requirement not imposed on noncommercial speech. With that in mind, they

might be conceived of as content-dependent subject to strict scrutiny. See, Members of City

Council v. Taxpayers for Vincent, 466 U.S. 789, 791-792, 816 (1984)(considering municipal code

prohibition on posting of signs on public property content-neutral while pointing out that, to create

an exception for political speech and not other types of speech, might create a risk of engaging in

constitutionally forbidden content discrimination); Central Radio v. City of Norfolk, 811 F.3d 625,

633 (4th Cir. 2016)(sign code that exempted governmental and religious flags, and works of art

not identified or specifically related to a product or service which nonetheless applied to private

flags and emblems as well as art that referenced a product or service, content-based); Peterson v.

Village of Downers, 103 F.Supp.3d 918, 923, 930 (N.D. Ill. 2015)(sign ordinance restricting

certain types of commercial signs but exempting governmental and other public signs, utility signs, garage sale notices, political signs and noncommercial signs, content based).

Yet, the First Circuit has cautioned that the concept of what constitutes a content-based as opposed to a content-neutral regulation has proven "protean in practice." Showtime Entertainment v. Town of Mendon, 769 F.3d 61, 72 (1st Cir. 2014). And the description is apt here. In 2015, the Supreme Court decided Reed, 135 S.Ct. at 2218, which, by some accounts, may have "worked a sea change" in First Amendment law, Blitz v. City of Slidell, 260 F.Supp.3d 656, 666 (E.D.La. 2017), bringing forth a different understanding of content discrimination. See, Norton v. City of Springfield, 806 F.3d 411, 412 (7th Cir. 2015)(Easterbrook, J.)(so noting). Reed arose out of a challenge to a sign ordinance enacted by and in effect in the Town of Gilbert, Arizona. That ordinance banned outdoor signs without a permit, but provided 23 exceptions for specific sign types, and imposed various restrictions on different sign types depending on which exemption applied. The provision exempted ideological signs and political signs from the ban, but imposed strict regulations on other sign types. Plaintiffs (a church and its pastor), challenged the law after the Town repeatedly cited the church for its failure to comply with the regulations imposed by the "Temporal Directional Signs Relating to a Qualifying Event" exemption, which encompassed signs directed at passersby that advertised events sponsored by a non-profit. Id. at 2225. The regulations applicable to such signs, which included size restrictions and time limits, were more restrictive than the limitations placed on ideological or political signs. Justice Thomas, joined by five other Justices, ruled that the exemptions were content based and did not survive strict scrutiny under the First Amendment. Id. at 2228.[20]

---

[20] Justice Alito, joined by Justices Sotomayor and Kennedy, joined the majority opinion, writing a concurring opinion that included a non-exhaustive list of signage regulations that would not trigger strict scrutiny. Id. at 2233. Justices Ginsberg, Breyer, and Kegan

Before <u>Reed</u>, when a regulation could be justified without reference to the content of the regulated speech – for example, the harmful effects of adult theaters or loud rock concerts – courts examined whether the regulation was a reasonable time, place, and manner restriction. <u>See</u>, <u>Blitch</u>, 260 F.Supp.3d at 666 (discussing issue). Nevertheless, <u>Reed</u> held that government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. <u>Id.</u> at 2227. It expressed that the meaning of the phrase "content based" requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys. <u>Id.</u> It pointed out that facially content-based regulations are automatically subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech. <u>Id.</u> at 2228. It stated that even where a regulation does not address content on its face, it will be considered content based if it cannot be justified without reference to the content of the regulated speech. <u>Id.</u> at 2227. And along this line, it made clear that the prior focus on a regulation's justification skipped the crucial first step in the content-neutrality analysis. <u>Reed</u>, 135 S.Ct. at 1228 (so observing).

As applied, <u>Reed</u> calls for a two-step inquiry to evaluate content neutrality. First, a court must determine if a law is content neutral on its face, a question dependent on whether the law facially applies to particular speech because of the topic discussed or the idea or message expressed, without regard to the government's purpose or justification, which are irrelevant in this stage. <u>Id.</u> Second, if the regulation does not expressly draw distinctions based on content, the court must examine whether the regulation cannot be justified without reference to the content of

---

concurred in the judgment, disagreeing with the principle that any content-based regulation necessarily triggers strict scrutiny. <u>Id.</u> at 2234-2239.

the regulated speech or was adopted by the government because of disagreement with the message the speech conveys.  Id. at 1227.  The facial-neutrality prong is antecedent to the justification prong.  Id. at 1228.

From this perspective, a provision targeting commercial but not noncommercial speech would be content based, for as observed in Reed, "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter."  Id. at 2230.  In Judge Easterbrook's words, "[t]he majority opinion in Reed effectively abolishes any distinction between content regulation and subject-matter regulation … [such that] [a]ny law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification."  Norton, 806 F.3d at 412.  How Reed has fared is appreciated by the way it has been approached.

In Thayer v. City of Worcester, 755 F.3d 60 (1st Cir. 2014), the First Circuit applied the pre-*Reed* model of evaluating content neutrality, concluding that the panhandling ordinances at issue were content neutral, as they were not adopted because of disagreement with the message conveyed and could be justified without reference to the content of the regulated speech.  Id. at 67-68, 70-71.  The Supreme Court vacated the decision, remanding it for further consideration in light of Reed.  See, Thayer v. City of Worcester, 576 U.S.----, 135 S.Ct. 2887 (2015)(vacating decision and remanding case).  In turn, the deciding panel remanded the entirety of Thayer to the district court.  See, Cutting, 802 F.3d at 82 & n.2 (describing procedural background); Thayer v. City of Worcester, 144 F. Supp. 3d 218, 221 (D.Mass. 2017)(same).  On remand, applying Reed and post-Reed cases, the district court held that one of the ordinances was content based and the other content neutral.  See, Thayer, 144 F.Supp.3d at 233-238 (explaining decision).

As for the intersection of Reed and commercial speech, a number of courts considering the issue have concluded that Reed does not apply to commercial speech, reasoning that Reed did not pertain to commercial speech and omitted any mention of Central Hudson and its progeny.  See, Geft Outdoor v. Consolidated City, 187 F.Supp 3d 1002, 1016-1017 (S.D. Ind. 2016)(so reasoning);  Contest Promotions v. City and County of San Francisco, 2015 WL 4571564, *4 (N.D. Cal. July 28, 2015)("Reed does not concern commercial speech and therefore does not disturb the framework which holds that commercial speech is subject only to intermediate scrutiny as defined by the *Central Hudson* test); California Outdoor v. City of Corona, 2015 WL 4163346, *10 (C.D. Cal. July 9, 2015)("Reed does not concern commercial speech, let alone bans on off-site billboards. The fact that Reed has no bearing on this case is abundantly clear from the fact that Reed does not even cite Central Hudson, let alone apply it").[21] But see, Central Radio, 811 F.3d at 628-629, 631-632 (applying Reed in action challenging city's sign ordinance brought by commercial property owner).

A different aspect of the content neutrality angle was raised in McLaughlin v. City of Lowell, 140 F.Supp.3d 177, 185 (D. Mass. 2015), where the court concluded that a panhandling ordinance was content-based in part because of McCullen v. Coakley, ---U.S.----, 134 S.Ct. 2518 (2014).  In McCullen, the Supreme Court held that a regulation is content based if it requires enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred.  Id. at 2531.  From this standpoint, given that municipal officials

---

[21] See also, Massachusetts Association of Private Career Schools v. Healey, 159 F.Supp.3d 173, 193 (D.Mass. 2016)("The Supreme Court has clearly made a distinction between commercial speech and noncommercial speech … and nothing in its recent opinions, including Reed, even comes close to suggesting that well-established distinction is no longer valid")(quoting CTIA-The Wireless Ass'n. v. City of Berkeley, 139 F.Supp.3d 1048, 1061 (N.D. Cal. 2015)); Peterson v. Village of Downers Grove, 150 F.Supp.3d 910, 927-928 (N.D. Ill. 2015)("[T]he majority [in Reed] never specifically addressed commercial speech … which is not surprising, because the Supreme Court did not need to address that issue: all of the restrictions at issue in Reed applied only to *non*-commercial speech.  What is important … is that, absent an express overruling of Central Hudson, which most certainly did not happen in Reed, lower courts must consider Central Hudson and its progeny … binding")(emphasis in original).

would have to examine the content of messages to determine if they involve commercial speech subject to the permit provisions, the provisions would be content-based. See, Thomas v. Schroer, 116 F.Supp.3d 869, 876 (W.D. Ten. 2015)(concluding that billboard and sign provision was content based because the only way to determine whether a sign was covered or exempt, was to consider the content of the sign). But like Reed, McCullen does not cite or discuss Central Hudson. Thus, on the whole, the issue of content neutrality was best left open for another day.

In this light, the court bypassed that issue, assumed the provision was content neutral, and following the parties' lead (Transcript Day Two-PM, pp. 86-99) evaluated the constitutional challenges under Central Hudson and, where appropriate, as standardless restrictions on speech. See, Watkins v. City of Arlington, 2014 WL 3408040, *5 (N.D. Tex. July 14, 2014)(assuming without deciding that challenged ordinance was a content-neutral regulation of speech). Based on the character of the expression and expressive activities plaintiffs were to engage in, the first Central Hudson prong was met. Similarly, the interests the Municipality invoked in support of the provisions qualify as substantial. They included traffic and pedestrian safety; community aesthetics; preservation of historic buildings; maintaining orderly flow of people; controlling crowds; and providing access for security and emergency vehicles. Yet, as explained below, in some instances the Municipality did not present evidence on the extent to which the harms the Municipality allegedly sought to prevent were real or to link those harms with the restrictions that it ultimately adopted, failing to satisfy various Central Hudson prongs. Furthermore, the prior-permit provisions lacked decisional and time-limit standards to guide official discretion. There was no need to examine the preemption challenge, given that plaintiffs were to use a duly authorized drone operator in compliance with the Ordinance's requirements.

### i. Section 9

Section 9 prohibited the installation, use, presentation, and raising of promotional inflatables for any item or product in Old San Juan, La Perla, La Puntilla, and Puerta de Tierra.[22] Even though the text suggests it only applied to traders or merchants – see footnote 3 – the Permits Office Director testified that the prohibition extended to all types of inflatables (Transcript Day One, pp. 124, 130). The court accepts the Director's narrowing interpretation to mean that the prohibition applied to both commercial and noncommercial speech. See, Ward, 491 U.S. at 795 (relying on narrowing construction given by city to relevant guideline, since in evaluating a facial challenge to a state law a federal court must consider any limiting construction proffered by a state court or enforcement agency).[23]

Plaintiffs' inflatables were 20-feet long, with several strings or tensors attached to them (Transcript Day One, pp. 81-82). But the prohibition was not limited to those types of inflatables, as it was broad enough to cover 20-inch long and smaller-sized balloons. There was no evidence explaining why prohibiting small-sized inflatables was necessary in this context. However, the Municipality's Public Security Commissioner testified that in Old San Juan, streets are very narrow, the sidewalks small, and the structures historical, some of them going back hundreds of

---

[22] For present purposes, Old San Juan, La Perla, La Puntilla, and Puerta de Tierra may be considered distinctly identifiable zones of the San Juan Islet.

[23] So interpreted, Section 9 would properly lie within the rubric of the *time, place, and manner* test. In general, that test has been applied to content-neutral provisions restricting or regulating commercial and noncommercial speech. See, E&J Equities v. Board of Adjustment, 146 A.2d 549, 581 (N.J. 2016)(explaining test); La Tour v. City of Fayetteville, 442 F.3d 1094, 1096-1097 (8th Cir. 2006)(applying *time, place, and manner* test to ban on electronic message boards displaying anything other than time, date, and temperature); Naser Jewelers, 513 F.3d at 30 (employing same test to review challenge to ordinance prohibiting all electronic messaging centers). As noted above, during the preliminary injunction hearing the court analyzed the provision in light of Central Hudson, which is "substantially similar" to the *time, place, and manner test*. Reilly, 533 U.S. at 554. Applying the elements set to measure Section 9's validity under such test, it could not have been enforced, which is unsurprising, given that, in essence, "the standards for content neutral restriction do not vary by whether the plaintiff is exercising commercial speech." Nasser Jewelers, 513 F.3d at 33. To this end, see, Prus v. City of Chicago, 711 F.Supp. 469, 470-471 (E.D. Ill. 1989)(ordinance failed under both the *Central Hudson* and *time, place, and manner* tests).

years, which, considering the amount of public expected to attend the festivities, made plaintiffs' inflatables a safety hazard (Transcript Day Two-PM, pp. 14-15). These concerns reflect substantial interests, given that combining the relatively short space between buildings, the plaintiffs' inflatables' characteristics, and the number of people likely to attend the festivities, in Old San Juan the inflatables' strings had a high potential of interfering with visitors, cause accidents, and damage historic buildings. See, Ballen, 466 F.3d at 742 (accepting promotion of pedestrian safety and community aesthetics as substantial governmental interests); Dills v. Cobb County, 593 F. Supp. 170, 172 (N.D. Ga. 1984)(acknowledging safety as a substantial government interest).

The situation in Old San Juan was comparable to that of La Perla and La Puntilla, and hence, in each of those locations the prohibition directly and materially advanced the asserted governmental interests and was not more extensive than necessary to serve those interests, at least in the case of inflatables like those of plaintiffs. Yet, the court could not so conclude in the case of Bahía Urbana and Puerta de Tierra, for there was no evidence that those areas shared the structural characteristics of Old San Juan, La Perla and La Puntilla or had special features justifying the prohibition therein.[24] The Permits Office Director could not explain why the prohibition was adopted (Transcript Day One, p. 129). The Public Security Commissioner said that placing a 20-feet long inflatable in areas close to Muñoz Rivera Avenue in Puerta de Tierra would be unsafe because the inflatable could distract drivers, cause an accident and obstruct the flow of transportation (Transcript Day Two-PM, p. 24).[25]

---

[24] Bahía Urbana is on the port front, close by Puerta de Tierra (Transcript Day Two-AM, pp. 66-67).

[25] Muñoz Rivera Avenue runs from the entryway to the San Juan Islet on its north side covering Puerta de Tierra up to Colón Square in Old San Juan (Transcript Day Two-PM, p. 19). Another avenue runs in the opposite direction. The avenues are connected by shorter streets running perpendicularly to the avenues, separated by blocks.

That a governmental interest may be substantial in the abstract does not mean that the harms the government has invoked are real, or that a restriction on speech will alleviate them to a material degree.  See, Edenfield v. Fane, 507 U.S. 766, 770 (1993)(so warning).  Therefore, when the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.  See, Turner Bd. Sys. Inc., 512 U.S. at 664 (so acknowledging); Watkins, 2014 WL 3408040 at *6 (expressing that to prevail, the government must do more than recite a significant government interest, even an interest of the highest order).

That is so because there may not be a problem, and a regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem did not exist.  See, Turner Bd. Sys. Inc., 512 U.S. at 664 (noting issue); Burkow v. City of Los Angeles, 119 F. Supp. 2d 1076, 1080-1081 (C.D. Cal. 2000)(the mere act of passing an ordinance is not evidence that there are problems justifying prohibitions of protected speech).  And even if the restriction on speech directly addressed a real problem and in a material way served the government's asserted interests, it would not be enough to satisfy the narrow-tailoring requirement.  See, Casey v. City of Newport, 308 F.3d 106, 115 (1st Cr. 2002)(applying principle).  In response to a First Amendment challenge the government must present evidence to: (1) establish that the ordinance addresses "actual harms with some basis in fact," Pagan v. Fruchey, 492 F.3d 766, 774 (6th Cir. 2007); (2) demonstrate that the restriction on speech in fact alleviates those harms to a material degree, Mason v. Florida Bar, 208 F.3d 952, 958 (11th Cir. 2000)(so noting); and (3) show that the restriction was no more extensive than necessary to serve the government's asserted interests,

Babkes v. Satz, 944 F.Supp. 909, 913 (S.D. Fla. 1996)(explaining need for evidentiary showing that statute was narrowly tailored).[26]

By this measure, the Commissioner's testimony did not suffice to carry the Municipality's burden. As support for his opinion, he referred to the "installation of the Ponce letters" (Transcript Day Two-PM, pp. 43-44). But the court could not take judicial notice of "Ponce-letter installation" or of problems related thereto, and there was no evidence on that installation's underlying factual circumstances to consider the installation as one comparable to the placement of inflatables in the locations at issue here. Conclusory assertions do not satisfy the government's burden under Central Hudson. See, Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 648-649 (1985)(invalidating restrictions on protected speech because the state's arguments amounted to "little more than unsupported assertions"); Edenfield, 507 U.S. at 771 (striking down challenged ban in part because affidavit tendered in support of the prohibition contained "nothing more than a series of conclusory statements that add[ed] little if anything to the …[government's] original statement of … justifications"); American Academy of Implant Dentistry, 860 F.3d at 304, 309-310 (law prohibiting dentists from advertising as specialists in areas that American Dental Association did not recognize as specialties invalid in part because, albeit the defendant Board of Dental Examiners invoked substantial interests to defend the law, it attempted to support its position with the personal experience of board members and two surveys in another case, but the personal experiences of board members "added little to the Board's argument" and the surveys were not in the record and district court "could not make an independent evaluation of their

---

[26] The *time, place, and manner* test carries an analogous evidentiary regime, requiring the government to present evidence to: (1) establish that the ordinance addressed a real harm; (2) demonstrate that the restriction on speech in fact alleviated the harm to a material degree; and (3) show that restriction was narrowly tailored to serve the government's interests. See, Turner Bd. Sys. Inc., 512 U.S. at 664 (addressing government's burden); Edwards, 755 F.3d at 1003 (same).

applicability to the facts before it); Ballen, 466 F.3d at 744-745 (excluding Code Enforcement

Officer's statement due to absence, by way of admissible evidence, of objective facts to support

the conclusions proffered in the statement).[27] A governmental interest "woven exclusively out of

the gossamer threads of speculation and surmise cannot be termed substantial." Showtime

Entertainment, 769 F.3d at 75.[28]

The Municipality relied on Metromedia v. City of San Diego, 453 U.S 490 (1981); Posadas,

478 U.S. at 328; and Fox, 492 U.S. at 469, to essentially argue that Section 9 did not violate the

First Amendment because it prohibited all promotional inflatables (Transcript Day 2-PM, pp. 91-

93). Blanket bans do not exempt the Municipality from submitting evidence to sustain the

prohibition under Central Hudson. "[B]road prophylactic rules may not be so lightly justified if

the protections afforded commercial speech are to retain their force." Ibanez, 512 U.S. at 143.[29]

And at bottom, neither Metromedia nor Posadas nor Fox supports the Municipality's view.

---

[27]  To that end, the declarant in Ballen stated: (1) "The city's ban on most portable and temporary signs … significantly and materially advances the City's interest in traffic safety and community aesthetics. The aggregate number of portable and temporary signs displayed within the City's jurisdiction has severely decreased as a result of this prohibition;" and (2) "The list of exemptions … has not materially detracted the effectiveness of the City's general prohibition on portable signs. In my professional judgment, experience and observation, the signs subject to the City's ban represent both a significant amount and percentage – if not an outright majority – of the total portable signage that would otherwise exist in the Redmond community absent the prohibition"). Id. at 744-745.

[28] Applying the same formulation under the *time, place, and manner* test, see, Weinberg v. City of Chicago, 310 F.3d 1029, 1038-1039 (7th Cir. 2002)(noting in sustaining challenge to ordinance that banned peddling, that even though city had invoked safety and congestion concerns to justify ordinance, the First Amendment demands more than mere facial assertions, requiring evidence not based on speculation, which city did not provide, failing to show disruption on traffic flow on sidewalks or streets), citing in part, Watseka v. Illinois, 796 F.2d 1547, 1556 (7th Cir. 1986), aff'd 479 U.S. 1048 (1987)(striking down ordinance that restricted solicitation due to, among other reasons, city's failure to offer evidence to substantiate its claim that the ordinance lessened the burden on its police force, which it claimed unregulated soliciting caused); Kuba, 387 F.3d at 860 (rejecting defendant's evidence as tautological, for it did not show congestion, the harm that defendant sought to address); Wexler v. City of New Orleans, 267 F.Supp.2d 559, 562, 567 (E. D. La. 2003)(city did not put on evidence to establish that prohibited activity would cause congestion or create a hazard for pedestrians, the interests asserted to justify the prohibition). Using the same formula in connection with a content based restriction, see Goedert v. City of Ferndale, 596 F.Supp.2d 1027, 1029, 1033-1034 (E.D. Mich. 2008)(successful challenge to city's ban on automobile horns during demonstrations to convey a message other than a warning, given that city did not come forward with evidence to substantiate Police Captain's feeling that honking of vehicle horns was a distraction that could lead to safety problems).

[29] The issue receives analogous treatment under the *time, place, and manner* test. See, Weinberg, 310 F.3d at 1039 (pointing out that use of "a speech restrictive blanket with little or no factual justification, flies in the face of preserving" First Amendment freedoms); D'Ambra v. City of Providence, 21 F. Supp. 2d 106, 114 (D. R. I. 1998)(total ban not narrowly tailored in part because

First, in Metromedia, the Supreme Court upheld San Diego's prohibition of offsite billboard advertising. See, 493 U.S. at 509. After noting the difficulty of applying broad First Amendment principles to unique forms of expression (id. at 500), the plurality stated that "[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method," finally pointing out it was dealing with "the law of billboards." Id. at 501 (internal citations and quotation marks omitted). To this end, it recited the Supreme Court's summary rulings upholding billboard restrictions; referred to the history of billboards; and emphasized the frequency with which governments had placed restrictions on billboards, observing that "[w]e likewise hesitate to disagree with the accumulated, commonsense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." Id. at 509. As the Sixth Circuit pointed out in Fruchey, 492 F.3d at 775, Metromedia concentrated on its own substitute for the evidence that Edenfield requires: "the collective judgment of many legislative and judicial decisionmakers." By contrast, the present record is devoid of comparable legislative or judicial history supporting the conclusion that a blanket prohibition on inflatables directly and materially advanced the Municipality's asserted interests.

Second, in Posadas, 478 U.S. at 328, the Supreme Court upheld a statute and regulations restricting advertising of casino gambling to residents of Puerto Rico. In doing so, it examined the history of legalized gambling in Puerto Rico (id. at 343 & n.8); and considered the legislature's belief that excessive casino gambling would produce serious harmful effects on the health, safety and welfare of Puerto Rico residents like disruption of moral and cultural patterns, the increase in

_____

it did not differentiate between those who would cause the secondary evils that the city sought to prevent and those who would not cause them).

local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime (id. at 341), observing that those were some of the very concerns that had motivated the vast majority of the 50 states to prohibit casino gambling. Id.

In that light, the Supreme Court concluded that Puerto Rico's Legislature reasonably believed, when it enacted the restrictions, that advertising of casino gambling aimed at the residents of Puerto Rico would serve to increase the demand for the product advertised (id. at 342); and given the narrowing construction of the advertising restrictions that the Puerto Rico Superior Court had put in place when it examined the provision's constitutionality, found that the challenged restrictions on commercial speech were no more extensive than necessary to serve the government's interest. Id. As in Metromedia, Posadas looked to its own substitute for the evidence that Edenfield calls for, but no such substitute was presented here. And equally important, it relied on a narrowing exercise conducted by the Superior Court of Puerto Rico, an exercise that the Municipality did not do.

In the same vein, a majority of the Justices in 44 Liquormart, 517 U.S. at 484, disavowed what they viewed as Posadas' deferential approach to the reasonableness of the asserted legislative purposes. See, 517 U.S. 509 (Stevens, J. plurality), 531 (O'Connor, J. concurring). In the principal opinion, Justice Stevens explained that "Posadas clearly erred in concluding that it was up to the legislature to choose suppression over a less speech-restrictive policy." Id. at 509. Concurring, Justice O'Connor stated that "[s]ince Posadas … this Court has examined more searchingly the State's professed goal, and the speech restriction put into place to further it, before accepting the State's claim that the speech restriction satisfies First Amendment scrutiny. Id. at 531. Because eight Justices disavowed this aspect of Posadas' analysis, Posadas does not lend support for the Municipality's argument that a blanket prohibition, without more, satisfies the First Amendment.

See, Rappa v. New Castle County, 18 F.3d 1043, 1057-1058 (3rd Cir. 1994)(discussing weight to be given to plurality opinions of the Supreme Court).

Third, in Fox, 492 U.S. at 469, the Supreme Court considered Central Hudson's last prong in the context of a regulation which, as applied in Fox, prohibited a demonstration of a company's products in a student's dormitory. Id. at 471-472. The District Court had granted a preliminary injunction but after a trial, found for the university on the ground that student dormitories were not a public forum for purposes of commercial activity and that the restrictions on speech were reasonable in light of the dormitories' purpose. Id. at 472. A divided panel of the Second Circuit reversed and remanded, concluding that it was unclear whether the regulation directly advanced the State's asserted interests and whether, if it did, it was the least restrictive means to that end. Id. at 473, 475-476.

The Supreme Court assessed whether restrictions upon commercial speech are invalid if they go beyond the least restrictive means to achieve the desired end. Id. at 471. It noted that it had not imposed upon the government the burden of demonstrating that the manner of restriction is absolutely the least severe that will achieve the desired end, rather than a means narrowly tailored to achieve the desired objective. Id. at 480. In that regard, the government must affirmatively establish a fit between ends and means that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, and carefully calculate the attendant costs. Id. To survive First Amendment scrutiny, then, a commercial speech prohibition must employ a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interests served; that employs not necessarily the least restrictive means, but a means narrowly tailored to achieve the desired objective. Id.

Still, "on the whole the challenged regulation should indicate that its proponent carefully calculated the costs and benefits associated with the burden on speech imposed by its prohibition." Greater New Orleans Broadcasting Ass'n, 527 U.S. at 188 (internal quotations omitted). And the record is devoid of proof that the Municipality made that calculus, for there is no evidence that it considered alternatives to the restriction in question. _Compare_ Globe Newspaper v. Beacon Hill Architectural Commission, 100 F.3d 175, 188-190 (1st Cir. 1996)(that Beacon Hill Architectural Commission conducted survey, prepared and considered report with alternatives and held a public hearing demonstrated that Commission carefully calculated the costs and benefits of regulation) _with_ In re R.M.J., 455 U.S. 191, 206 (1982)(no indication of effort to proceed along a "less restrictive path") _and_ Casey, 308 F.3d at 115 (in contrast with Globe Newspaper, there was no evidence that City considered and rejected alternatives to restriction at issue and its reasons for doing so). As noted therein, "[w]e do not see how the 'substantially broader than necessary' determination [can] be made … absent some consideration of the alternative of enforcing the … ordinance." Id.

In all, the Municipality did not demonstrate that the harms it referred to were real as to Bahía Urbana and Puerta de Tierra; that the prohibition directly advanced its proffered interests to a material degree therein; or that the prohibition was not more extensive than necessary to serve the interests invoked to support it. Therefore, as applied to those locations, the prohibition did not adhere to applicable constitutional parameters. See, Edenfield, 507 U.S. at 769-773 (rejecting under Central Hudson's third prong state's claim that ban on personal solicitation by CPA's directing advanced state's interest in ensuring ethical nature of practice because state presented no evidence of such connection); Reilly, 533 U.S. at 561 (uniformly broad sweep of geographical limitation demonstrated lack of tailoring under Central Hudson's fourth prong); Ocheesee

Creamery v. Putnam, 851 F.3d 1228, 1240 (11th Cir. 2017)(restriction on product labeling invalid, as state failed to introduce evidence on Central Hudson's last prong to show that the prohibition was not more extensive than necessary to serve its interest); American Academy of Implant Dentistry, 860 F.3d at 310-312 (law prohibiting certain advertising by dentists invalid under Central Hudson's third and fourth prongs for lack of sufficient evidence to support ban; while the restriction might have been permissible "in the abstract," it "was not permissible on the record before the court"); El Día, Inc., 413 F 3d at 115-116 (regulation defective under Central Hudson's second prong due to absence of evidence to support allegation that the harms the government recited were real); Peterson, 150 F.Supp.3d at 929-930 (because there was no evidence showing that the targeted signs posed a traffic safety problem, the Village could not show that the restrictions directly advanced that interest as required by Central Hudson's third prong).[30]

### ii. Section 14.

Section 14 prohibited, without written permission from the Municipality's Permit Office, the distribution of promotional products or samples of commercial products, a commercial product comprising "material susceptible" of being sold and purchased or of another "economic transaction" (Docket No. 1-2, p. 11).[31]  Considering how the Municipality conceptualized the Ordinance to control commercial advertising and regulate the way businesses operated during the

---

[30] The same result is reached under the *time, place, and manner* test.  See, Turner Broad. Sys. Inc., 512 U.S. at 668 (vacating district court decision that content-neutral regulation of speech was constitutional because facts in the record failed to establish that narrow-tailoring requirement was met); López v. Town of Cave Creek, 559 F.Supp.2d 1030, 1034-1035 (D. Ariz. 2008)(noting in striking down ordinance, that town provided no evidence that traffic safety was endangered by day laborers soliciting employment from vehicle occupants); Watkins, 2014 WL 3408049 at *7-*8 (ordinance defective, as city did not present evidence to support its contention that prohibition of interactions between pedestrians and occupants of vehicles at certain intersections addressed city's concerns over pedestrian and traffic safety).

[31] According to the text of the Section, the permit requirement applied to the installation of inflatables in public areas and facades. In light of the Permits Office Director's testimony interpreting Section 9 of the Ordinance as a total ban, the court did not examine the inflatable permit aspect of Section 14.

Festivities, this Section targeted commercial promotions. As for its application, the Permits Office Director testified that the Municipality was concerned with: (1) the increased cost of cleaning because people threw flyers out into the street after holding them in their hands for few minutes; (2) products that could be used as projectiles; and (3) products with soaps and detergents, given that if thrown upon the ground they could cause an accident, particularly if it rained (Transcript Day One, pp. 131-132).

These concerns reflect substantial interests, but are not exclusive of commercial speech. See, Madsen v. Women's Health Center, Inc., 512 U.S. 753, 768 (1994)(acknowledging strong state interest in ensuring public safety on public streets and sidewalks in case involving antiabortion picketing); U.S. v. Crowthers, 456 F.2d 1074, 1076-1077 (4th Cir. 1971)(recognizing in evaluating the application of leafletting regulation to a "Mass for peace," that government has a substantial interest in the maintenance of cleanliness and beauty of city and its governmental environs). When two expressive activities cause the same effect underlying the government's asserted interest and only one of those activities is banned or restricted, the provision faces an underinclusiveness hurdle to its validity, as underinclusiveness undermines the defendant's claim that the provision can be justified by reference to the interest it has asserted. See, Showtime Entertainment LLC, 769 F.3d at 73 (examining underinclusiveness).[32]

From this perspective, Section 14 did not satisfy Central Hudson's third prong. In the end, it left noncommercial speech unregulated, immune from the permit requirement, in effect

---

[32] To be sure, underinclusive classifications have been upheld on the sound theory that a legislature may deal with one part of a problem without addressing all of it. See, Erznoznik v. City of Jacksonville, 422 U.S. 205, 215 (1975)(so recognizing). However, this commonsensical presumption of validity has been accorded less force when a classification turns on the subject matter of expression. Id. In those instances, exceptions that make distinctions among different kinds of speech must relate to the interest the government seeks to advance. See, Showtime Entertainment LLC, 769 F.3d at 73-77 (explaining distinction). It that were not so, the regulation would not materially advance its aim. See, Pearson v. Edgar, 153 F.3d 397, 404 (7th Cir. 1998)(recognizing that if a regulation has exceptions that undermine and counteract the interest the government claims it adopted the provision to further, the regulation cannot directly and materially advance its aim under Central Hudson's third prong).

neutralizing the attempt to address the problems that the Permits Office Director mentioned, without evidence to explain the difference in the treatment accorded to commercial expressive activity. See, Johnson v. Minneapolis Park and Recreation Board, 729 F.3d 1094, 1100-1101 (8th Cir. 2013)(invalidating underinclusive regulation restricting literature distributors but not street musicians and performers from park streets during Festival, as Board presented little evidence to support government's argument that the restriction on leaflets but not performers prevented congestion); Central Radio, 811 F.3d at 634 (sign code unconstitutionally underinclusive, as there was no evidence in the record that secular flags were any more distracting that exempted religious ones, or that a large work of art displaying a reference to a product threatened the safety of motorists any more than any other large exempted piece of art); Transportation Alternatives v. City of New York, 218 F.Supp.2d 424, 439-440 (S.D. N.Y. 2002)(regulation imposing $ 6,000 park permit fee on groups with commercial sponsorship defective because city did not explain how its interest in reducing harm on park was directly advanced by the higher fee imposed on those groups but not on other groups interested in using the same park), *aff'd on other grounds*, 340 F.3d 72 (2d Cir. 2003); Anabell's Ice Cream Corp. v. Town of Glocester, 925 F. Supp. 920, 929 (D.R.I. 1996)(enjoining enforcement of ordinance that, as applied, prohibited merchants but not nonmerchants from using loudspeakers, amplifiers and electronic noisemaking devices without a justification for the difference in treatment).[33]

---

[33] See also, City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 424-425 (1993)(striking down ordinance which banned from sidewalks newsracks distributing commercial handbills but not those distributing traditional newspapers in part because the distinction between commercial and noncommercial speech bore no relationship to the governmental interests asserted; even though both types of newsracks constituted an "eyesore," the evidence in the district court identifying secondary effects attributable to the commercial newsracks to distinguish them from the traditional newsracks was exceedingly weak, and the court of appeals discounted it); Carey v. Brown, 447 U.S. 455, 465 (1980)(sustaining challenge to statute permitting labor but not nonlabor picketing, as nothing in the labor-nonlabor distinction had any bearing on the statute's legitimate interest in privacy); Satz, 944 F. Supp. at 912-913 (state statute that prevented lawyers and other parties from using information contained in public records regarding recent traffic citations to solicit clients considered defective, because it exempted commercial driving schools, which contradicted the state's claim that the statute advanced state's interest in preserving the privacy of citizens and lessening solicitation abuse, and

On a different level, Section 14 lacked narrow, objective and precise criteria to guide government officials in evaluating whether to issue a permit, and imposed no time limits to act on permit applications.  In other words, it lacked minimum safeguards required for a recognition of validity.  See, Shuttlesworth v. City of Birmingham, Ala, 394 U.S. 147, 151 (1969)(criteria such as public welfare, decency, good order, morals, and convenience insufficient to curtail an official's discretion in granting parade permits); FW/PBS, 493 U.S. at 226-227 (holding content-neutral licensing scheme unconstitutional for lack of adequate limits on the time that decisionmaker had to issue license); Desert Outdoor Advertising, Inc. v. City of Moreno Valley, 103 F.3d 814, 818 (9th Cir. 1996)(invalidating permit requirement that authorized issuance of permit upon city officials' finding that sign would "not have a harmful effect upon the health or welfare of the general public" because the standard was too ambiguous and subjective to confine discretion); Pennsylvania Pride, Inc. v. Southampton Tp., 78 F.Supp.2d 359, 365 (M.D. Pa. 1999)(licensing scheme defective due to absence of deadline for issuing or denying license).

The lack of decisional criteria reflects absence of narrow tailoring, making the Section inadequate to restrict constitutionally protected speech.  See, Gaudiya Vaishnava Society, 952 F.2d at 1065-1066 (noting absence of narrow tailoring in enjoining city from enforcing policy code against plaintiffs and others because the chief of police had complete discretion to grant or deny permits); Berger v. Rhode Island Board of Governors for Higher Education, 832 F. Supp. 515,

---

there was no evidence that exempting commercial driving schools actually advanced those interests); E&J Equities v. Board of Adjustment, 146 A.2d 623, 643-644 (N.J. 2016)(ordinance prohibiting digital billboard while permitting static billboards was defective, as factual record did not explain how the distinction supported the government's interests: while township invoked aesthetics and safety, record provided no basis to discern how static billboards were more aesthetically palatable than digital billboard, and  safety concern was founded on unsupported suppositions; in the end, the record provided no explanation of the "qualitative differences" between the static and digital billboards in light of the interests asserted to justify the restriction on protected speech).

518-519 (1993)(pre-advertisement permit requirement not narrowly tailored in part due to lack of criteria to guide Board in determining whether a submitted advertisement passed muster).[34]

**iii**. *Section 18*

Section 18 prohibited owners of businesses and/or residences from renting or ceding their balconies in order to carry out promotions, or for commercial advertising to be deployed for such purposes and/or to display products from those balconies without a permit from the Municipal Permits Office.  Consistently with defendants' conceptualization of the Ordinance as a measure to control commercial advertising, they read this Section as one linked to commercial efforts and propaganda (Transcript Day 2-AM, p. 20), and to the promotion of commercial material and merchandise (Transcript Day 2-PM, p. 43).  Accordingly, the permit requirement targeted commercial promotions and attendant advertising and product displays.

The Public Security Commissioner testified that in the area of Old San Juan known as the Colonial City (the "Casco of Old San Juan"), many structures have been affected with the passage of time, and some of the balconies or part of them have become displaced and fallen on the pavement and sidewalks, harming people and causing damage to property and vehicles (Transcript Day 2-PM, pp. 26-27).  To avoid having balconies let loose, he stated that the Municipality tried to prevent people from using the balconies in an indiscriminate way.  Id.  To this end, the Permits Office Director testified that Section 18 required permits in order for applicants to submit a structural study conducted by an engineer on the capacity of the balconies to support the extra weight expected to be added on the structures during the Festivities (Transcript Day Two-AM, pp. 11-12).

---

[34] As discussed above, absence of narrow tailoring dooms regulations under the *Central Hudson* and the *time, place, and manner* tests.

The interest asserted is substantial.  See, Weinberg, 310 F.3d at 1038 (noting city's interest "in protecting its citizens and ensuring that its streets and sidewalks are safe for everyone"). However, Paragraph 4 of the Section textually circumscribed the structural study requirement to situations where the Municipality and the Puerto Rico Fire Department had inspected the balcony, finding it in a state of disrepair, and the Fire Department recommended that a structural certificate be obtained, not to other structures where expressive activity could be conducted.  The Permits Office Director acknowledged that the Ordinance so limited the structural certificate requirement but stated it would be convenient to require the certificate in case of all balconies (Transcript Day Two- AM, pp. 12-15).  Yet, that is not what the section stated, and from that angle, the Section's text was not narrowly tailored to address the interest the provision was designed to protect, as it also conditioned promotions and advertising in buildings that were not in a state of disrepair.  Thus, Section 18 did not survive Central Hudson's third and fourth prongs.[35]  Compare with, City of Renton v. Playtime Theatres, 475 U.S. 41, 52 (1986)(city ordinance was narrowly tailored because it affected only the category of theaters shown to produce the secondary effects city sought to address).

Shifting lenses, Section 18 did not include narrow, objective, and definite criteria to guide government officials in evaluating whether to issue a permit other than in connection with balconies in state of disrepair, and lacked time limits for officials to act on a permit application, making it invalid under the First Amendment.  See, Nationalist Movement v. City of Boston, 12 F.Supp.2d 182, 193-194 (D. Mass. 1998)(finding city's parade permit regulation invalid because

---

[35] As for balconies located in structures in state of disrepair, the structural study requirement applied with equal force to residential and commercial structures.  In light of the Permits Office Director's testimony, it complied with the First Amendment in all respects. Plaintiffs did not express any interest in conducting commercially expressive activity in structures in state of disrepair.

it placed no limits on government official's discretion to grant or withhold permit, making the decision on whether to grant permit entirely *ad hoc*); Solantic, LLC, 410 F.3d at 1272. (invalidating sign code for failure to impose time limits for permitting decisions affecting speech).[36]  As with Sections 14 and 18, the lack of decisional standards to condition exercise of protected speech reflects an unconstitutional absence of narrow tailoring.  See, Beckerman, 664 F.2d at 509-511 (ordinance not narrowly drawn because it allowed official to deny a permit without precise guidelines, if in his opinion unlawful conduct "on the part of others" would result from parade); Deferio v. City of Syracuse, 306 F. Supp. 3d 492, 514 (N.D. N.Y. 2018)(unfettered discretion to enforce parade buffer zone not narrowly tailored).

   **iii.**     *Section 19*

        Section 19 prohibited temporary signage on public facades or on public spaces, including temporary signage to look outside through a glass façade during the Festivities, and commercial "comparsas," without the approval of the Municipality's Permits Office.  Signs are a form of expression protected by the First Amendment.  See, City of Ladue v. Gilleo, 512 U.S. at 48 (so recognizing).  As a means of communication they are particularly valuable, in part because they entail a relatively small expense in reaching a wider audience, allow flexibility in accommodating various formats, typographies and graphics, and convey their message in a manner that is easily read and understood by readers and viewers.  See, Taxpayers for Vincent, 466 U.S. at 819 (Brennan, J., dissenting)(examining topic).

---

[36] Section 18 also banned throwing promotional materials or any other objects from balconies or elevated platforms.  The prohibition directly promoted the need to prevent injury to pedestrians at street level from objects – commercial or not – thrown from on above, and was no more extensive than necessary to serve that interest.  The provision stands on its own.

Unlike oral speech, signs take up space, may obstruct views, and pose other problems that legitimately call for regulation. See, Gilleo, 512 U.S. at 48 (so explaining). To that extent, governments may regulate the physical characteristics of signs, just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise. Id. Yet given that regulation of a medium inevitably affects communication itself, municipal ordinances prohibiting or regulating the display of signs are subject to First Amendment scrutiny. Id. Section 19 does not survive such scrutiny.

First, the Permits Office Director testified that "perhaps" the Municipality wished to: (1) protect the image of the city, given that it is a history city; and (2) prevent excessive exposure to advertising (Transcript Day Two-AM, pp. 23-24). The Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden." Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 392 (2000)(articulating proposition). So, hypothesized justifications are insufficient to sustain restrictions on commercial speech. See, Thompson v. Western States Medical Center, 535 U.S. 353, 373, 377 (2002)(applying formulation in finding speech-related provisions of statute unconstitutional). Unlike rational basis review, "the Central Hudson standard does not permit [courts] to supplant the precise interests put forward by the State with other suppositions." Edenfield, 507 U.S. at 768. The government has the burden of showing "that there is evidence supporting … [the ordinance's] proffered justification." Horina v. City of Granite City, 2006 WL 13891, *3 (N.D. Ill. May 19, 2006).

On that premise, Section 19 fell short of satisfying defendants' burden under Central Hudson's second, third and fourth prongs. See, Pagan, 492 F.3d at 776-777 (ordinance failed Central Hudson's second prong because even though Village "perhaps" hoped to avoid unsightly signage cuttering neighborhood streets, "perhaps" sought to avoid having its streets filled with

vehicles that may often not be the sort of automobiles people would like to have parked on their neighborhood streets, or "perhaps" the signed posted on cars were simply not in keeping with the character of the Village's neighborhoods, "it was not the place of a reviewing court to supply hypothetical justifications for speech regulation"); Mc Lean v. City of Alexandria, 106 F. Supp. 3d 736, 742-743 (E.D. Va. 2015)(ordinance was defective given that, assuming city had substantial interest in promoting traffic and pedestrian safety, it nonetheless speculated without evidence as to why ordinance was enacted in the first place, hypothesizing about various scenarios where displaying the prohibited sign could constitute a threat to the public safety or welfare); Park Outdoor v. Town of Onondaga, 708 F.Supp.2d 241, 246 (N.D. N.Y. 2010)(finding ordinance invalid where town proffered no evidence of any governmental interest taken into account in adopting the ordinance); Peterson, 103 F.Supp.3d at 929-930 (denying motion to dismiss because, aside from the ordinance's own generic language, the village offered nothing to shed light of the actual scope of the asserted problems (ostensibly, aesthetics, property values and safety), without which it was impossible to evaluate whether the ordinance indeed advanced narrowly-drawn solutions to deal with substantial governmental issues); Watkins, 2014 WL 340840 at *6-*8 (city's decision to stand on ordinance to defend it without evidence, was inadequate to show ordinance was narrowly tailored); Horina, 2006 WL at *3 (enjoining ordinance in part because city failed to conduct fact-gathering on ordinance's stated purpose).[37]

Second, the Permits Office Director stated that in evaluating permit requests, the Municipality looked beyond the Ordinance, to a "Joint Regulation" setting forth specific signage

---

[37] See also, Pearson, 153 F.3d at 402, 404-405 (holding unconstitutional under Central Hudson's third and fourth prongs, statute that prohibited residential real estate solicitation but not other types of solicitation, inasmuch as state produced no evidence that "blockbusting" was a problem or that real estate solicitation harmed or threatened to harm residential privacy, the harms asserted to justify enactment of the statute).

requirements (Transcript Day Two-AM, pp. 27-28). Yet, a purview of the Joint Regulation shows there are signs and advertisement that do not require permits. Section 29.1.5 ("Signs and Advertisements that do not require permits"), includes within this category "[t]emporary signs and advertisements for a period no longer than ninety (90) days for the purpose of calling attention to an activity, campaign, idea or message of governmental, civic, political, commercial, religious, charitable, artistic, sports or similar kind in any zoning district or in areas not zonified," provided they comply with the following criteria:

1. Authorization from the Department of Transportation and Public Works or any municipal authority, whichever is the case, when proposing to locate the signs on rights of way of public roads, sidewalks and posts in public utility structures, in a parallel or perpendicular position to the public road;

2. Authorization by the property owner, lessee or holder in private or public land;

3. The height, measured from ground level to its highest part, shall not exceed thirty feet;

4. The size will not be greater than two hundred (200') square feet;

5. The signs may not have intermittent illumination;

6. In the case of commercial signs and advertisements, the signs may only be installed in conjunction with the celebration of the festival or activity, in which case they may not be installed more than thirty days from the activity's date.

7. The sign must be removed not later than five days after the end of the activity.

The effect of the challenged restriction on commercial speech "ha[s] to be evaluated in the context of entire regulatory scheme, rather than in isolation." Greater New Orleans Broadcasting Ass'n, 527 U.S. at 192. Contextually, the Joint Regulation does not save Section 19, for it applies to a category of public space comprised by rights-of-way of public roads, sidewalks and posts in public utility structures, not to facades of privately-owned buildings, enumerating the characteristics that signs must have in order to be considered authorized. But to the extent it

authorized signs in situations that Section 19 did not, it counteracted the government's asserted interests, defeating without evidentiary justification their regulatory purpose under Central Hudson's third prong. See, Rubin, 514 U.S. at 486-489 (discussing why federal law that prohibited labels on beer products from showing alcohol content while authorizing the same information on wine and spirits did not comply with Central Hudson's third prong).[38] And it would call into question why the Municipality did not simply follow the Joint Regulation's criteria to regulate temporary signs as an obvious means more narrowly tailored to achieve the Municipality's desired objective, a problem leading to invalidation under Central Hudson's fourth prong. See, New York State Ass'n of Realtors, Inc. v. Shaffer, 27 F.3d 834, 844 (2nd Cir. 1984)(regulation restricting commercial speech failed in part under Central Hudson's fourth prong, because state did not determine whether less restrictive measures, including measures that were in effect prior to issuance of solicitation ban at issue, would provide an alternate means for effectively combating the harm that the state invoked); Jornaleros v. City of League City, 945 F.Supp.2d 779, 798 (S.D. Tex. 2013)(pedestrian solicitation law enforced against day laborers to prevent them from soliciting employment in the city found constitutionally defective in part because defendants did not show why other traffic laws were inadequate to serve the public's legitimate interest in traffic safety and control).

To this end, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the

---

[38] See also, Knowles v. City of Waco, 462 F.3d 430, 436-437 (5th Cir. 2006)(city parade ordinance requiring a permit for parades or street activity on city's public ways, with exceptions for funeral processions, students going to and from classes, and a government agency acting within the scope of its functions invalid in part because, even though city argued that the ordinance's goal was that of promoting traffic safety, the city disregarded that goal in enacting the exceptions); Saieg v. City of Dearborn, 641 F.3d 727, 736-737 (6th Cir. 2011)(permitting sidewalk vendors but not leafletters, belied significance of interest in maintaining clear sidewalks and ensuring crowd control).

regulation.  See, Ward, 491 U.S. at 799 (examining issue).  A regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech restrictive alternative.  Id. at 800.  It is not necessary for the government to demonstrate that "the distinguishment is 100% complete or that the manner of restriction is absolutely the least severe that will achieve the desired end."  Fox, 492 U.S. at 480.  As noted above, the standard is met if there is a reasonable fit between the restriction and the government interest it serves.  Id. (so noting).

Withal, the standard does not mean that a regulation may burden substantially more speech than is necessary to further the government's legitimate interests.  See, Ward, 491 U.S. at 799 (articulating constraint).  The government bears the burden of explaining why less drastic methods of safeguarding its interest are not available, and the burden is not satisfied with speculation devoid of evidence.  See, Casey, 308 F.3d at 113-115 (striking down ordinance because less burdensome alternatives must be considered in connection with the inquiry into whether, absent the challenged regulation, the government's interests are achieved less effectively, and City did not explain why it could not have relied on a less burdensome alternative to the restriction in question).  In this regard, the evidentiary record evinced no explanation for the Municipality's choice of restriction.

Third, the Permits Office Director expressed that kiosks were licensed to operate during the Festivities (Transcript Day One, pp. 116-117).  They did so with signs (Transcript Day Two – AM, p. 69).  Nevertheless, the record does not clearly indicate the criteria pursuant to which those signs were authorized.  The Permits Office Director mentioned size (id.), albeit he clarified that the Ordinance did not so state.  Id. at pp. 69-70.  The inconsistencies cannot be squared with Central Hudson.  See, Greater New Orleans Broadcasting Ass'n., 527 U.S. at 189 (invalidating advertisement restriction because of inconsistencies in regulatory regime and operation);

Neighborhood Enterprises v. City of St. Louis, 644 F.3d 728, 737 (8th Cir. 2011)(zoning code sign regulation failed strict scrutiny, for even though it sought to promote safety and aesthetics, city failed to demonstrate how these interests where served by applying the regulation to some types of signs but not others); Ballen, 466 F.3d at 742 (city failed to show how the exempted signs – including temporary window signs and signs on kiosks – were no less a threat to vehicular and pedestrian safety and community aesthetics than the prohibited signs); Dillis, 593 F.Supp. at 192 (upholding challenge to county ordinance where county presented no evidence that the prohibited portable signs were more dangerous than the exempted signs).

Fourth, as previously mentioned, "comparsas" are a group of two or more people with distinctive clothing or features carrying a message. In the case of plaintiffs, the "comparsas" bore the logo of the product brands being promoted (Transcript Day One, p. 12). The Permits Office Director justified the permit requirement by the need to coordinate activities during the Festivities (Transcript Day Two-AM, p. 52). The Municipality's Public Security Commissioner expressed that in 2013, a "comparsa" had a train built out of wood and carried it through the crowd, posing the potential risk that the heavy object – the train – would fall on other people (Transcript Day Two-PM, p. 33).[39] He said that during the Festivities, people are stuck one against the other in crowds that move like waves, and when comparsas arrive they make it difficult to handle the mass of people in the crowd. Id. at pp. 33-34. He stated that people throw themselves at comparsas when comparsas distribute materials or products. Id.

As with other sections of the Ordinance, those concerns are not exclusive of commercial speech. See, Cox v. New Hampshire, 312 U.S. 569, 574 (1941)(stating in case involving

---

[39] No further explanation was proffered about the characteristics of the "train" or the circumstances surrounding its use.

prosecution for failure to obtain a permit to carry out a parade or procession to express religious beliefs, that municipalities have the authority to adopt regulations to assure the safety and convenience of the people in the use of public highways); Thomas, 534 U.S. at 321-322 (permit system designed in part to coordinate multiple uses of limited park space, applied to evaluate challenge by political activists who sought permit to hold rallies advocating legalization of marijuana); Forsyth County, 505 U.S. at 127, 130 (applying permit requirement to organization that intended to demonstrate in opposition to the federal holiday commemorating the birthday of Dr. Martin Luther King, Jr., as the requirement promoted the government interest in regulating competing uses of a public forum); Saieg, 641 F.3d at 735-736 (applying leafletting restriction to religious ministry's members interested in distributing literature while roaming at a Festival in order to relieve pedestrian overcrowding, limit disorderliness, enhance traffic flow, and minimize threats to public safety).

However, the provision left unfettered noncommercial expression implicating the same interests, without evidence to explain the difference in the treatment accorded to the commercial "comparsas." The evidentiary vacuum did not comport with Central Hudson's third and fourth prongs. See, Showtime Entertainment LLC, 769 F.3d at 74 (striking down underinclusive zoning bylaws, since there was no cognizable difference in aesthetic impact between a large building hosting adult-entertainment activities subject to restriction and a large building hosting a bridge club or a bible study within the adult entertainment overlay district); Dimmitt v. City of Clearwater, 985 F.2d 1565, 1570 (11th Cir. 1993)(evidence insufficient to establish that asserted interests in aesthetics and traffic safety were served by the distinction between exempted and non-exempted flags); FF Cosmetics, 866 F.3d at 1301 (preliminary injunction prohibiting enforcement under Central Hudson, of ordinance which restricted commercial soliciting but allowed charitable

solicitations, artists and vendors in the same area, as City offered no explanation for the difference in treatment between the speakers).

Finally, like the permit requirements previously discussed, Section 19's permit requirements failed to set forth narrow, objective, and definite criteria to guide government officials in considering whether a permit should be issued, and lacked a decisional timeframe. As a result, they fell squarely within the ambit of unconstitutionality. See, Crowthers, 456 F.3d at 1080-1081 (finding leafletting permit regulation without objective standards "void on its face"); U.S. v. Frandsen, 212 F.3d 1231, 1240 (11th Cir. 2000)(holding unconstitutional, regulation that merely required a permit to be issued "without unreasonable delay" because it failed to adequately confine the time within which the decision maker had to act). Without decisional standards, they were not narrowly tailored to serve a substantial government interest. See, Toga Society v. Lee, 323 F.Supp.2d 779, 792 (E.D. La. 2004)(ordinance not narrowly tailored due to unbridled discretion it accorded to official to impose security costs related to parade permit)(*citing in part* Saia v. People of State of New York, 334 U.S. 558, 559-560 (1948)(finding not narrowly drawn ordinance that delegated to the police chief authority to allow or disallow the use of speakers and lacked without any prescribed standard for the exercise of this discretion such as hours or decibel levels)).[40]

### *v.*     ***Section 22***

Section 22 prohibited the use of flying items, equipment or objects such as helicopters and drones during the Festivities, except those authorized by government agencies with authority in

---

[40] During the preliminary injunction hearing, the court stated the first paragraph of Section 19 complied with Central Hudson, albeit it enjoined enforcement of the paragraph due to lack of precise and objective criterial to be considered by officials in evaluating a permit request (Transcript Day Two-PM, p. 104). Revisiting the issue in the process of drafting this Opinion and Order, for the reasons discussed above, the first paragraph did not comply with Central Hudson.

law, and those belonging to the Municipality, sponsors and parties responsible for production.

Plaintiffs challenged the authority of the Municipality to prohibit drones over the Islet's airspace,

arguing that federal law preempts airspace regulation. There is authority to support plaintiffs'

challenge. See, Singer v. City of Newton, ---F.Supp.3d---- (D. Mass. 2017), 2017 WL 4176477,

*6 (D. Mass. September 9, 2017)(holding portions of municipal ordinance relating to ownership

registration and operation of pilotless aircraft preempted by the FAA Modernization and Reform

Act of 2012, Pub. L. No. 112-95 § 332, 126 Stat. 11, 73 (2012)(codified at 49 U.S.C. § 401 note)).

All the same, plaintiffs were to use a operator authorized by the Federal Aviation Administration

(Transcript Day Two-PM, pp. 55, 64). That being so, irrespective of potential preemption

problems, they were to act in compliance with Section 22's textual requirements.

## A.  Irreparable Injury

Because plaintiffs made a strong showing of likelihood of success on the merits of their

First Amendment claim, they satisfied the irreparable injury component of the preliminary

injunction analysis. See, Sindicato Puertorriqueno de Trabajadores, 699 F.3d at 11 (so holding).

As the Supreme Court has explained, "[t]he loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373

(1976); Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla, 490 F.3d 1, 21

(1st Cir. 2007)(applying Elrod to irreparable harm component of permanent injunction analysis);

Maceira v. Pagán, 649 F.2d 8, 18 (1st Cir. 1981) ("It is well established that the loss of first

amendment freedoms constitutes irreparable injury.").

## B.  Balance of Equities

The balancing of equities requires the court to balance the parties' relative harms; that is, "the

potential injury to the plaintiffs without this injunction versus the potential injury to the defendants

with it in place." See, Issa v. School District of Lancaster, 847 F.3d 121, 143 (3rd Cir. 2017). The fact that plaintiffs raised serious First Amendment questions sharply tipped the balance of hardships in their favor. See, Blitch, 260 F.Supp.3d at 673 (applying formulation in enjoining panhandling ordinance under First Amendment). What is more, they were diligent. The Ordinance became effective on January 5, 2018. Two business days later, Ms. Rivera stopped by the Municipality's Permits Office to apply for a temporary use permit. The Permits Technician informed her that the Office would take three or four days to evaluate the application. Three days into that period, Ms. Rivera followed up on the status of the application, only to be told that it had been "filed" or closed. The same day, PAPC initiated the action, amending the complaint to include the affiliated companies two days later. Plaintiffs did not sit idly to let time pass instead of taking reasonable steps to protect their rights in court.

### C. Public Interest

Enjoining the implementation of the challenged Sections of the Ordinance as previously discussed prevented likely infringement of constitutionally protected speech during the Festivities in a way consistent with, and which promoted, the public interest. Injunctions protecting First Amendment freedoms "are always in the public interest." Texans for Free Enterprise v. Texas Ethics Commission, 732 F.3d 535, 539 (5th Cir. 2013).

## IV.    CONCLUSION

For the reasons stated:

1. The request for preliminary injunction was DENIED as to Section 9, the denial limited to Old San Juan, La Puntilla, and La Perla. However, it was GRANTED with respect to Bahía Urbana and Puerta de Tierra.

2. The request for preliminary injunction was GRANTED as to Section 14.

3.  The request for a preliminary injunction was GRANTED as to the first Paragraph

of Section 18 and DENIED as to the second Paragraph.

4.  The request for preliminary injunction was GRANTED with regard to the first and

second Paragraphs of Section 19.

**SO ORDERED.**

In San Juan, Puerto Rico, this 10th day of December, 2018.

s/Pedro A. Delgado-Hernández<br>
PEDRO A. DELGADO-HERNÁNDEZ<br>
United States District Judge